UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SELECTIVE INSURANCE COMPANY  :
OF AMERICA                                 :
                                                   :
        v.                                 :        C.A. No. 11-042S
                                                   :
CMG, INC., and JAMES M. COLUCCI  :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

      Pending before the Court is Plaintiff Selective Insurance Company of America's ("Selective") Motion for Summary Judgment (Document No. 41) filed pursuant to Fed. R. Civ. P. 56. Defendants CMG, Inc. and James M. Colucci filed an Objection to the Motion for Summary Judgment. (Document No. 44). This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72(a). A hearing was held on September 28, 2012. After reviewing the Memoranda submitted, listening to the arguments of the parties and conducting independent research, I recommend that Selective's Motion for Summary Judgment be GRANTED.

**Statement of Facts**

      Selective is a New Jersey corporation with its principal place of business in Branchville, New Jersey. (Document No. 42, ¶ 1). CMG is a Rhode Island corporation with its principal place of business in Cranston, Rhode Island. Id. ¶ 2. CMG is engaged in the development and construction business. Id. ¶ 4. James M. Colucci, President of CMG, is an individual residing in North Scituate, Rhode Island. Id. ¶ 3; Document No. 49, ¶ 1. In connection with its development and construction business, CMG is at times required to provide certain subdivision and/or

maintenance bonds.  (Document No. 42, ¶ 5).  CMG engaged Selective, as its surety, to issue the bond in dispute in this case.  Id. ¶ 11.

## 1. The Bond Application and Indemnity Agreement

On January 30, 2006, CMG and Mr. Colucci entered into an Agreement of Indemnity ("Indemnity Agreement") with Selective in order to obtain a subdivision bond.  Id. ¶ 6; Document No. 41-2, pp. 10-13.  The Indemnity Agreement was incorporated into the "Contract, Bid or Maintenance Bond Application" executed by CMG and Mr. Colucci.  (Document No. 41-2, p. 10).  Paragraph 5 of the Indemnity Agreement provides that CMG and Mr. Colucci, as Indemnitors must:

> [I]ndemnify and save [Selective] harmless from and against every claim, demand, liability, cost, charge[,] suit, judgment and expense which [Selective] may pay or incur in consequence of having executed, or procured the execution of, [the] bond or bonds [applied for by the Indemnitors], or any renewals or continuations thereof or substitutes therefor, including fees of attorneys, whether on salary, retainer or otherwise, and the expense of procuring, or attempting to procure, release from liability, or in bringing suit to enforce the obligation of any of the Indemnitors under [the Indemnity] Agreement.

(Document No. 41-2, p. 12).

The Indemnity Agreement further provides that if Selective makes payment on any claim, demand or suit asserted against it as a result of Selective having executed or procured the execution of a bond applied for by the Indemnitors, the Indemnitors will be jointly and severally obligated to "accept the voucher or other evidence of such payment as prima facie evidence of the propriety [of Selective's payment] and of the Indemnitors' liability therefore...."  Id.

Paragraph 8 of the Indemnity Agreement gives broad powers to Selective to determine whether or not to settle a suit brought against CMG or Selective in connection with bonds issued by

Selective in reliance on the Indemnity Agreement. Id.; Document No. 42, ¶ 10. Paragraph 8 specifically provides:

> [Selective] shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against [Selective] or [CMG] upon [the] bond or bonds [applied for by the Indemnitors] shall be settled or defended and its decision shall be binding and conclusive upon the Indemnitors. In the event that it becomes necessary or advisable in the judgment of [Selective] to control, administer, operate or manage any or all matters connected with the performance of the contract for the purpose of minimizing any possible loss or ultimate loss to the Indemnitors and [Selective], the Indemnitors hereby expressly covenant and agree that such action on the part of [Selective] shall be entirely within its rights and remedies under the terms of [the Indemnity Agreement] and as surety, and does hereby fully release and discharge [Selective], in this connection, from liability for all actions taken by it or for its omissions to act except for deliberate and willful malfeasance."

Id.; Document No. 42, ¶ 10.

### 2.   **Issuance of Bond B202721**

After the Indemnity Agreement was executed, Selective (as surety) issued a subdivision bond on behalf of CMG (as principal) bearing bond number B202721 ("the Bond") in favor of the Town of Millbury, Massachusetts (the "Town"). (Document No. 42, ¶ 11; see also Document No. 48, pp. 5-9). The Bond was issued with the Town's Planning Board as Obligee in connection with the issuance of a special permit by the Town for the construction of an extension to a roadway known as Oakes Circle, and related improvements (the "Project"). Id. The Bond secured the performance by CMG of the portions of the work for the Project set forth in the "Engineer's Construction Cost Estimate" dated January 27, 2006 prepared by Graves Engineering, Inc. and attached to and made part of the Bond. (Document No. 42, ¶ 12; Document No. 41-2, pp. 21-24). The work described in the Engineer's Construction Cost Estimate was to be completed within a period of two years from

the date of the Bond, or any extensions thereof. (Document No. 42, ¶ 14). The Bond jointly and severally bound CMG and Selective to the Town for a penal sum of $100,902.00. Id. ¶ 15. The Bond was to remain in effect until CMG satisfactorily performed and completed the work on the Project within the agreed-to time frame. The Bond was signed, sealed and delivered to the Town on February 1, 2006. (Document No. 42, ¶ 13).

### 3.    The Two Versions of Bond B202721

It is undisputed that there are two versions of the Bond. (See Document No. 48, pp. 5-8). Both versions of the Bond bear the same number and the same date and both were signed by Mr. Colucci on behalf of CMG. (Document No. 47, ¶ 11). Further, both versions cover the Project and are for the same penal sum. There are, however, two key differences between the Bonds.

The first difference between the Bonds is that the first version was signed by Peter J. Troy, Selective's authorized agent and attorney-in-fact. Id. The second version, by contrast, contains a signature that purports to be that of Peter J. Troy; however, it is in different handwriting than the first version and Mr. Troy swore in his Affidavit that it was not his signature. Id.; Document No. 48, ¶ 4. Mr. Troy also testified that he did not authorize anyone else to execute the so-called second version of the Bond on his behalf. (Document No. 48, ¶ 4). Mr. Troy stated that he has "no knowledge as to how the Second Bond came to be, or why it may have been issued." Id. ¶ 5. According to CMG, the first version of the Bond was never delivered to the Town by CMG and remained in CMG's possession until CMG presented it to Selective and the Court in connection with this case. (Document No. 47, ¶ 11).

In addition to the discrepancy with Mr. Troy's signature, the other key difference between the two versions of the Bond lies in the description of the Project. The first version of the Bond simply states:

> WHEREAS, the said construction and improvement details affecting said bond, guarantees the improvement to be placed within the rights-of-way, of Oakes Circle, Millbury, MA
>
> Road Completion
>
> which the principal has agreed with the obligee to install[.]

(Document No. 49, p. 8).

The second version of the Bond, by contrast, provides significantly more detail as to the Project. The second version states:

> WHEREAS, pursuant to the terms of an April 4, 2003 special permit granted by the obligee to Blackstone Valley Realty Trust, Principal wishes to construct an extension to a roadway known as Oakes Circle, in Millbury, MA, and related improvement, all such work being shown on a plan entitled: "Oakes Circle, a Condominium Community in the Town of Millbury," prepared by Heritage Design Group, dated September 18, 2002, and last revised February 10, 2003;
>
> WHEREAS, in accordance with Condition 4(b) of said special permit, Principal seeks to provide security for the completion of those portions of the above said construction and improvements set forth in the Engineer's Construction Cost Estimate, prepared by Graves Engineering Inc., dated January 27, 2006 and attached hereto[.]

(Document No. 41-2, p. 19).

### 4. The Town's Claim on Bond B202721

In a letter dated February 13, 2008, the Town advised Selective that it had decided to demand the penal sum of the February 1, 2006 Bond due to CMG's default on the obligations which the Bond secured. Document No. 47, ¶ 16; Document No. 41-2, p. 18. The Town claimed that CMG

had not made any progress on the Project during the previous two years. (Document No. 42, ¶ 16). On March 13, 2008, Counsel for CMG sent a letter to the Town advising it of CMG's position that "the Town [ ] did not have and does not have authority to require a bond for private improvements." (Document No. 41-2, p. 27). Counsel also characterized the Bond as being "illegally required" by the Town and noted that, "[w]e have instructed Selective not to in any way honor your request to 'take the bond.'" Id. p. 28.

On April 1, 2008, CMG sent a letter to Selective advising it that CMG intended to file a preemptive legal action to prevent the Town from moving forward on the Bond based on the position asserted in its March 13, 2008 letter. (Document No. 42, ¶ 17; Document No. 41-2, p. 26). On April 22, 2008, Selective sent a letter back to Counsel for CMG advising CMG that it had established a reserve of $100,902.00 in connection with the pending claim and demanded that CMG post collateral with Selective pursuant to paragraph 6 of the Indemnity Agreement. (Document No. 42, ¶¶ 17-19; Document No. 41-2, p. 33). Selective's letter stated that it is "simply not willing to take a position with the obligee that the bond [Selective] issued was never intended to be honored." (Document No. 41-2, p. 33). Selective also noted that "[t]he time to file [a preemptive] action is fleeting. If you plan to do so, please file the action now and send a copy [to Selective]." Id. CMG did not post collateral with Selective and never commenced the preemptive action against the Town as advertised. (Document No. 42, ¶¶ 20, 21).

In May 2010, the Town sued Selective and CMG in Massachusetts Superior Court. See Town of Millbury v. CMG, Inc. et. al., WOCV2010-01110-C. The lawsuit sought payment on the Bond for CMG's failure to perform its obligations. (Document No. 42, ¶ 22; Document No. 41-2, p. 43). After investigation and in accordance with paragraph 8 of the Indemnity Agreement,

Selective determined that the lawsuit should be settled and that the Town should be paid. The lawsuit was settled on or about March 11, 2011 when the Town and Selective entered into a Release & Assignment agreement which resolved all disputes and potential disputes between the Town and Selective arising from the Project. Selective agreed to and paid the Town the entire penal sum of the Bond. Document No. 42, ¶ 25; Document No. 41-2, p. 66.

Since settling the lawsuit with the Town, CMG and Mr. Colucci have refused to reimburse Selective. On September 22, 2010, Selective filed the present three-count Complaint in the United States District Court for the District of New Jersey. (Document No. 1). The case was transferred to this District on February 10, 2011. (Document No. 15). In its Complaint, Selective seeks contractual indemnification and common law exoneration and indemnification from CMG, Inc. and Mr. Colucci, including costs, expenses and attorneys' fees. (See Document No. 1). Selective's Motion for Summary Judgment seeks entry of judgment in its favor as to both liability and damages. (Document No. 41-1).

**Summary Judgment Standard**

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support

the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**Discussion**

In their Objection to the Motion for Summary Judgment, CMG, Inc. and Mr. Colucci identify several factual issues, which they claim are material and preclude entry of judgment at this time.

### A. Mr. Troy's Signature on the Bond/Delivery of the Bond

The first argument raised by Defendants relates to the two versions of the Bond. Defendants claim that neither of the two versions of the Bond are legally operative because they each have defects. Thus, Defendants conclude that Selective has no recourse against them for the money it unilaterally paid to the Town. Starting with the first version of the Bond, Defendants argue that because that version was signed by Selective's attorney-in-fact, Mr. Troy, it is the only Bond that could possibly be enforced. Defendants then argue that the first version of the Bond could not be operative because it was never delivered to the Town.

Turning to the second version of the Bond, Defendants assert that without an authorized signature by Selective's attorney-in-fact, the second version is "without any legal effect as to Selective." (Document No. 46, p. 10). Thus, Defendants contend that "neither such subdivision bond was effective, and, as such, Selective simply took it upon itself to satisfy certain purported obligee claim(s) and thus, artificially created its own damages." (Document No. 46, p. 2).

Even assuming, as I am required to do given the state of the record and the dictates of Rule 56, that the first version of the Bond was never delivered to the Town and that Mr. Troy did not sign the second version of the Bond on behalf of Selective, both of Defendants' arguments fail. First, the undisputed facts plainly show that CMG intended to acquire a bond in the Town's favor. Mr. Colucci completed the "Contract, Bid or Maintenance Bond Application" on behalf of CMG, which indicates that CMG is the Applicant and that the obligee is the Town of Millbury. (Document No. 41-2, p. 10). Further, the Application lists the Contract and Estimate of Work price as $100,902.00. The "Character of Work" is described as "Top Coat Road Construction" and the Agreement of Indemnity which is incorporated into the Application is signed by James Colucci, individually, and

as President of CMG. Id. pp. 10, 13. The Application and Indemnity Agreement is dated January 30, 2006. (Document No. 42, ¶ 6). Each of these facts is undisputed and demonstrates Defendants' intent to obtain a bond for the exact parties and the Project for which the Bond was ultimately issued.

It is also undisputed that on February 1, 2006, Selective issued a bond in the amount of $100,902.00, Number B202721, which Mr. Troy signed on behalf of Selective and Mr. Colucci signed on behalf of CMG. (Document No. 49, p. 8). According to CMG, this so-called first version of the Bond was never delivered to the Town and describes the project secured as "Road completion." Id. The so-called second version of the Bond is also Number B202721, and was also signed by Mr. Colucci on behalf of CMG on February 1, 2006. (Document No. 41-2, p. 19). The second-version of the Bond incorporates the Graves Engineering report as an attachment, and provides a more detailed description of the Project. Id. While neither party has offered an explanation for the existence of the two versions, the only reasonable explanation is that the first version was presented to the Town and rejected because it did not contain sufficient detail as to the Project. Because the Town was requiring the Bond and it had obtained the detailed cost estimate from Graves Engineering, common sense dictates that the Town was the primary party with an interest in requiring additional detail concerning the work guaranteed by the Bond.[1]

From the parties' submissions, it is evident that neither Selective nor the Town was aware that the authenticity of the Bond in the Town's possession was contested by CMG at the time the

---

[1] While the first version of the Bond generally described the work as "Road Completion," the second version referenced an April 4, 2003 "special permit" issued by the Town for the Project and incorporated a January 27, 2006 "Engineer's Construction Cost Estimate" obtained by the Town for the "remaining construction at the Oakes Circle residential development" which included road completion, sidewalks, landscaping, drainage and other site work. (Document No. 41-2, pp. 19-24). The estimate was based on the uncompleted work as of a January 26, 2006 site visit by Graves. Id.

Town's claim on the Bond was paid. In fact, the second version of the Bond that contains the signature disclaimed by Mr. Troy, was the Bond presented to Selective in connection with the Town's claim and the same one that was attached to the Massachusetts State Court Complaint in which both Selective and CMG were sued. Also, it is undisputed that Mr. Colucci signed both versions of the Bond on February 1, 2006. Mr. Colucci admits that "in or about early, 2008, the Town made claim against the Second Bond, and, in so doing, placed both CMG and Selective on notice with regard to the same." (Document No. 49, ¶ 14). CMG did not protest that the Bond lacked authenticity until this case was commenced and well underway, despite having ample opportunity to do so prior to Selective's decision to honor the Bond.

CMG cannot avoid the consequences of a bargained-for Bond merely by asserting at the eleventh hour that the signature of the surety's agent is inauthentic. CMG, by and through Mr. Colucci, applied for the Bond, evidenced their intent to be bound by signing the Indemnity Agreement and both versions of the Bond on February 1, 2006, and acquiesced to the Town's demand for the Bond.[2] This course of conduct indicates that Defendants intended to obtain a bond to cover the Project. Selective, in good faith, entered into the Indemnity Agreement and issued the Bond for the purposes and the parties described in the bond Application. Relieving Defendants of liability under such circumstances would result in a windfall unjustly enriching them and depriving Selective of the benefit of its bargain in entering into the Indemnity Agreement and issuing the Bond at Defendants' request.

---

[2] It is my understanding that CMG provided the Bond in early 2006 in order to obtain occupancy permits from the Town for the condominium residences located within the Project that were needed to close the sale of such residences. (Document No. 41-2, pp. 45-46).

Moreover, CMG has not pointed the Court to any injury-in-fact it suffered as a result of the inauthentic signature of Mr. Troy on the second Bond. If any party had standing to complain about a phony signature under these circumstances, it would be Selective, the Surety and Obligor on the Bond. Instead, Selective investigated the claim, found it to be valid, and, in good faith, paid the amount of the Bond to the Town in 2011.

The facts in this case are unusual and thus it is not surprising that neither side has cited any surety case law directly on point. However, the parties' course of conduct, Defendants' intentions in applying for the Bond and acquiescing in the Town's demand for a Bond, common sense and equity are all sufficient to convince me that the discrepancy concerning Mr. Troy's signature is not a genuine issue of material fact in this case that should preclude the entry of summary judgment in Selective's favor.

**B.     The Town's Legal Authority to Require the Bond**

Defendants also contend that the Town could not legally require them to obtain a Bond because the work to be completed was on a private right-of-way. In his Affidavit, Mr. Colucci asserts that "CMG challenged the so-called subdivision bond requirement, and, in so doing, reserved any and all of its rights and/or remedies with regard to the same." (Document No. 49, ¶ 5). In its March 13, 2008 letter to the Town, Counsel for CMG repeatedly characterized the Bond as "illegally required." (Document No. 41-2, pp. 27-28). All of these after-the-fact protests, however, do not undo the fact that CMG, on its own accord, applied for the Bond and agreed to be bound by the Indemnity Agreement. Mr. Colucci admits that in January 2006 "CMG made application to Selective..." and that "CMG, as well as me, in my capacity as CMG's President, entered into an Agreement of Indemnity [ ] with Selective." (Document No. 49, ¶ 6). Regardless of CMG's

subjective belief that it was not required to obtain a bond, CMG acquiesced to the bond requirement by filing an application and by signing both an Indemnity Agreement and the Bond(s) at issue.

Moreover, Defendants' contention that the Town had no legal right to require a bond is unsupported and untimely. Defendants had ample opportunity to seek judicial relief from the bond requirement before they applied for the Bond, signed the Indemnity Agreement and ultimately obtained a Bond for the Project in early 2006. In addition to acquiescing to the Town's demand for the Bond in 2006, Defendants also failed to take their opportunity to raise any such defense in 2008, when they were put on notice that the Town made a claim against the Bond. Although CMG's counsel advised Selective that it intended to "take preemptive legal action" against the Bond, it never did so. Again in 2010, CMG failed to assert its rights and challenge the bond requirement in connection with the underlying Massachusetts State Court litigation initiated on the Bond by the Town against CMG and Selective. Since CMG acquiesced to the bond requirement and failed to follow through on any "preemptive legal action" before Selective made a reasonable decision in 2011 to pay the Town's claim on the Bond, there is simply no reasoned basis upon which to invalidate the plain terms of a bargained-for contract based on Defendants' unilateral and unsubstantiated protest that the Bond was illegally required and its failure to obtain any timely legal determination to that effect.

      **C.**      **The Scope of Unfinished Work and Damages**

Defendants also argue that Selective should not have paid the entire penal sum of the Bond. Defendants assert that while they were conducting work on the Project, there were disagreements with the Project's Condominium Association concerning the installation of sidewalks as well as certain lighting infrastructure. (Document No. 49, ¶¶ 10, 11). Defendants claim that aside from

these discrete issues that the Condominium Association was contesting, "CMG did complete virtually all of the other site work....." (Document No. 49, ¶ 11). Defendants contend that the remaining work "would cost no more than $50,000.00 to complete..." Id. ¶ 12. CMG apparently attempted to "negotiate with the Town to resolve the disputes," but the Town "had no interest in compromising its position." Id. ¶ 13.

Defendants' complaints regarding the scope of the remaining work hold little water in the face of the plain language of the Indemnity Agreement, which provides that Selective has broad discretion to investigate and settle any claims arising from a dispute over the Project. The Indemnity Agreement affords Selective "the exclusive right to determine for itself and the [Defendants] whether any claim or suit brought against [Selective] or [CMG] upon [the Bond] shall be settled or defended and [Selective's] decision shall be binding and conclusive upon [the Defendants]." (Document No. 42, ¶ 10).

Like other contracts, an indemnity agreement is to be viewed in its entirety, and the contract language should be accorded "its plain, ordinary, and usual meaning."[3] Rodrigues v. DePasquale Bldg. & Realty Co., 926 A.2d 616, 623-624 (R.I. 2007). The Rodrigues Court went on to point out that absent proof of duress, "it is a basic tenet of contract law that the contracting parties can make as good a deal or as bad a deal as they see fit...." Id. In the present case, the Indemnity Agreement is clear and unambiguous that the decision-making power as to the settlement of any claims on the Bond rests with Selective.

---

[3] As Selective points out, a threshold matter is the choice of law in this diversity case. Plaintiff is a New Jersey resident, Defendants are Rhode Island residents and the project at issue was located in Massachusetts. Selective asserts that the substantive law of all three jurisdictions regarding contractual indemnity and common law indemnification and exoneration would "yield the same result," rendering a choice of law analysis unnecessary. Defendants have not disputed this assertion, and the Court will proceed with an analysis of these claims under Rhode Island's substantive law. (See Document No. 41-1, p. 10, fn.1).

Defendants have presented absolutely no evidence of fraud or bad faith on Selective's part that would provide the only defense in a case such as this. In 2002, the First Circuit stated that, "when a surety brings an action pursuant to an indemnity agreement giving the surety broad discretion to pay claims, the only defense an indemnitor can raise is that the surety committed fraud or collusion in paying the claim." Fireman's Ins. Co. of Newark, NJ. v. Todesca Equip. Co., 310 F.3d 32, 35 (1st Cir. 2002) (citation omitted). While collusion is one of Defendants' twenty-one affirmative defenses in this case, Defendants have presented absolutely no evidence to this Court that Selective acted in collusion with the Town, or anyone else, to defraud Defendants in this case. Moreover, Defendants apparently negotiated with the Town at length regarding the scope of the uncompleted work, but acknowledge that they did not complete the work because the Town refused to compromise. During the period when the Town was negotiating with CMG, or as their discussions broke down, Defendants could have commenced their own litigation to challenge the Town's position, but Defendants failed to do so.

Reviewing the record in the light most favorable to CMG and Mr. Colucci, it establishes, as a matter of law, that CMG and Mr. Colucci have no viable legal defenses regarding the Bond in issue and are bound by the terms of the Indemnity Agreement they freely entered into. Accordingly, I recommend that the District Court enter judgment in favor of Selective on all three Counts of the Complaint.

### 4.   Damages

In addition to moving for summary judgment with respect to liability, Selective has also moved for summary judgment as to damages as there are no material facts in dispute. Selective is seeking costs, expenses and attorneys' fees through March 31, 2012 in the amount of $34,985.53

as well as the penal sum of the Bond which they paid to the Town, $100,902.00.  (Document No. 42, p. 7).

Because I am recommending that the District Court grant the Motion for Summary Judgment in full as to liability, it is also appropriate to assess damages.  It is undisputed that Selective paid the penal sum of the Bond to the Town and had the contractual right and obligation to do so under these circumstances.  Thus, I recommend that the Court assess damages against Defendants jointly and severally in the amount of $100,902.00 plus costs, expenses and attorneys' fees.  In addition, if the District Court adopts this Report and Recommendation, I further recommend that it enter an Order directing Selective to submit its final Motion for Attorneys' Fees and supporting Affidavits within fourteen days thereafter.  See LR Cv 54.1.

**Conclusion**

For these reasons, I recommend that Selective's Motion for Summary Judgment (Document No. 41) be GRANTED.  Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b); LR Cv 72.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

  /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
January 3, 2013